AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

### for the

### Central District of California

<table>
<tr><td>

**LODGED**
CLERK, U.S. DISTRICT COURT

**4/3/25**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MRV _____ DEPUTY

</td></tr>
</table>

United States of America

v.

Eliana Villa Acevedo,

Defendant

<table>
<tr><td>

**FILED**
CLERK, U.S. DISTRICT COURT

**4/3/2025**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ cld _____ DEPUTY

</td></tr>
</table>

Case No.   2:25-mj-02013-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of April 2, 2025 in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1029(a)(2) | Use of Unauthorized Access Devices |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/*
*Complainant's signature*

Lindsay Sandoval, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    April 3, 2025

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Maria A. Audero, U.S. Magistrate Judge
*Printed name and title*

AUSA: Matthew J. Tako (x0705)

### **AFFIDAVIT**

I, LINDSAY SANDOVAL, being duly sworn, declare and state as follows:

### I.  **PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of a criminal complaint against Eliana VILLA ACEVEDO ("VILLA") for a violation of 18 U.S.C. § 1029(a)(2) (use of unauthorized access devices).

2.    This affidavit is also made in support of an application for a warrant to search: a Samsung cellular phone (IMEI 352415376072033) seized from VILLA ("SUBJECT DEVICE 1"); and an Apple iPhone (IMEI number 353223146604260 seized from a navy blue Mazda SUV ("SUBJECT DEVICE 2" and, with SUBJECT DEVICE 1, the "SUBJECT DEVICES"), both of which are currently in the custody of Homeland Security Investigations ("HSI"), in Paramount, California, as described in Attachment A.

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 1029 (Fraud and Related Activity in Connection with Access Devices), 1344 (Bank Fraud), and 1028A (Aggravated Identity Theft) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and

search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

5.    I am a Special Agent with HSI and have been so employed since June 2019.  I am currently assigned to the El Camino Real Financial Crimes Task Force ("ECR"), where I investigate matters concerning bank fraud, wire fraud, identity theft, money laundering, and other illegal financial transactions.

6.    Prior to being assigned to ECR, I was assigned to the Office of the Assistant Special Agent in Charge, Los Angeles International Airport responsible for investigating weapons trafficking and smuggling organizations using the U.S. international mailing facility and/or international airport to illegally transport and sell firearms and firearm parts throughout the greater Los Angeles area.

7.    Prior to becoming an HSI Special Agent, I was employed for nine years as a military intelligence analyst and human intelligence collector for the California Army National Guard, working alongside HSI and supporting narcotics investigations. In this role, I assisted in numerous federal investigations by providing investigative research and analysis into money laundering organizations and drug trafficking organizations.

8.   I have completed approximately six months of training at the Federal Law Enforcement Training Centers, where I completed the Criminal Investigator Training Program and HSI Special Agent Training Program.  During my training, I was trained in conducting criminal investigations and received hundreds of hours of comprehensive, formalized instruction into financial crime, money laundering, drug trafficking, drug smuggling, human trafficking, street gangs, trade fraud, and asset identification, seizure, and forfeiture.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

9.   Between January 2024 and January 1, 2025, the California Department of Social Services ("DSS") has detected more than $126.8 million in stolen funds from victim Electronic Benefit Transfer ("EBT") cards.  This fraud is from two specific programs known as CalFresh and CalWORKS, which help low-income households pay for housing, food, and other necessary expenses. Many of the fraudulent withdrawals are done at specific ATMs in the Central District of California.

10.  On or about April 2, 2025, at approximately 5:30 a.m., law enforcement conducted physical surveillance at a Wells Fargo Bank located at 701 E Main St, Alhambra, CA 91801 ("Target Bank"), which was identified by DSS as one of the top ATM locations for EBT fraud. Law enforcement officers were positioned nearby such that they could see individuals walking up to the Target Bank's ATMs and conduct transactions at the ATMs. In addition, law enforcement teams reviewed transaction

information provided by Fidelity Information Services, LLC
("FIS").

11.  At approximately 6:27 a.m., law enforcement saw VILLA
arrive at an ATM terminal located at the Target Bank where law
enforcement was conducting surveillance. VILLA withdrew
approximately $1,600 in cash from the ATM in rapid succession
using approximately five different access devices.  One access
device was used two times, for a total of six attempts to
withdraw cash by VILLA.  Law enforcement detained VILLA and
found approximately seven access devices (later determined to be
cloned cards, five of which had the same EBT card information
VILLA used to withdraw $1,600 in cash from the ATM). VILLA was
arrested and found to be in possession of approximately $1,700
in cash and the SUBJECT DEVICES.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

12.  Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

### A.  Regulatory Background of CalFresh and CalWORKs Programs

13.  DSS is a government agency that administers several
benefit and assistance programs for residents of the state of
California.  One of the assistance programs administered by DSS
is called CalFresh (formerly known as food stamps), which helps
low-income households purchase food and household items to meet
their nutritional needs.  Another assistance program
administered by DSS is called CalWORKs, which helps low-income

families with children pay for housing, food, and other necessary expenses.

14.  Residents of California that meet the criteria established by the CalFresh or CalWORKs programs can apply online for benefits at www.getcalfresh.org and www.benefitscal.com.  Beneficiaries apply for benefits by submitting their income and number of dependents to determine their benefit eligibility.

15.  CalFresh and CalWORKs benefits are issued through Electronic Benefit Transfer cards ("EBT cards").  EBT cards are mailed to an address designated by the account holder and function like traditional debit cards to conduct transactions. For example, you can use an EBT card to make a purchase at a grocery or convenient store by swiping the card at a point-of-sale terminal.

16.  The EBT cards issued under CalFresh and CalWORKs are assigned specific Bank Identification Numbers ("BIN").  A BIN refers to the first five digits of the account number on a debit or credit card and can be used to identify the issuer of the card, like DSS, which administers the CalFresh and CalWORKs programs.

17.  Benefits received through the program are typically disbursed to EBT cardholders by DSS during the early days of each month.  Those benefits are deposited directly from DSS into the account of the EBT cardholder.

18.  The EBT cardholders can then conduct cash withdrawals at automated teller machines ("ATMs") using a personal

identification number ("PIN") established by the card holder. The EBT cardholder presents the card at an ATM, inserts the card into the ATM card reader, and utilizes a PIN to withdraw the funds previously deposited by DSS intended for beneficiaries of the CalFresh or CalWORKs programs.

**B.    Background on EBT Fraud in the Los Angeles Area and Prior State and Federal Operations**

19.   Since in or about August 2022, local law enforcement has been working with DSS to investigate a significant increase in unauthorized cash withdrawals utilizing EBT cards.  Based on analysis of victim complaints to DSS, victim complaints to local law enforcement, bank records, and surveillance, law enforcement determined that the majority of the unauthorized cash withdrawals were being conducted with cloned cards.

20.   A cloned card can be a blank white plastic card or another debit, credit or gift card that contains altered information on the card's magnetic stripe.  Based on my training and experience, I know that suspects will often clone cards by taking stolen card information from a victim card's magnetic stripe and re-encode that stolen information onto another card's magnetic stripe.  Cloning these cards allows the suspect to use the card and the DSS benefits added on to the account linked to the card for illicit purchases or unauthorized cash withdrawals.

21.   On a legitimate debit or credit card, the information contained on the card's magnetic stripe will match the information embossed on the front of the card.  This information includes the account number, expiration date, and cardholder's

name, among other information.  Whereas on a cloned card, the information contained on the magnetic stripe will not match the information embossed on the front of the card.  For example, if a suspect re-encodes victim EBT card information onto a pre-existing gift card's magnetic stripe or a blank white plastic card with a magnetic stripe, the magnetic stripe will be encoded with the EBT card information, but the card itself will still bear the embossed information of the gift card or bear no information if it is a blank white plastic card.

22.  Based on my training, experience, and participation in this investigation, I know that the victim card data harvested to clone cards is often obtained from what is colloquially referred to as "skimming activity."

23.  The term "skimming" is used to describe activity that involves unlawfully obtaining debit and credit card information by using technological devices to surreptitiously record victim accountholder's debit and credit card numbers and personal identification numbers at, for example, ATMs or point-of-sale terminals.  For example, individuals conducting ATM "skimming" may install a skimming device into the card reader of the ATM to record the debit or credit card numbers, as well as a camera or keypad overlay on the ATM keypad to record the associated PIN number.  Those individuals will then return to the ATM to collect the card number and PIN information stored on the installed device.

24.  As described above, suspects then manufacture cloned and fraudulent debit or credit cards that bear the victim

accountholder's account information that was obtained from
skimming.  Once that information is loaded onto another
fraudulent card (e.g., a gift card or blank plastic card),
members of the scheme then use that fraudulent card to withdraw
cash from the victim accountholder's bank accounts or to make
purchases with the victim accountholder's account.

     25.  In or about September 2022, local law enforcement
conducted a surveillance and arrest operation in the Los
Angeles, California area.  This operation was planned in
response to the large number of unauthorized withdrawals
occurring at ATMs in the Los Angeles area during a short period
of time.  Specifically, law enforcement had analyzed fraudulent
EBT withdrawal data and noticed a high volume of unauthorized
withdrawals on specific dates and times that coincided with the
dates when the majority of benefits are disbursed to EBT
cardholders.

     26.  As a result of this operation, local law enforcement
established surveillance at select ATMs that were used to
conduct a significant volume of EBT fraud.  Law enforcement
surveilled those ATMs around the dates when benefits had been
disbursed, observed suspects that withdrew a high volume of
unauthorized withdrawals and that conducted those withdrawals in
rapid succession, and arrested multiple individuals believed to
be making fraudulent withdrawals of EBT benefits.  As a result,
law enforcement arrested approximately 16 suspects.  All of the
arrested suspects were later determined to be citizens of
countries other than the United States who did not have

documentation to be lawfully present in the United States.  All
of the individuals arrested were released from local custody
within hours of their arrest and absconded from any future
judicial proceedings.

27.  In or about February 2023, in response to a further
increase in unauthorized cash withdrawals utilizing EBT cards
after the local law enforcement September 2022 operation,
federal law enforcement conducted a similar surveillance and
arrest operation in the Los Angeles, California area.  Law
enforcement established surveillance around the dates when
benefits had been disbursed at select high-volume EBT fraud
ATMs.  Law enforcement arrested three suspects that withdrew a
high volume of unauthorized withdrawals and that conducted those
withdrawals in rapid succession.  Two of those defendants came
to the ATM together, possessed 35 cloned EBT cards at the time
of arrest, and later analysis of historic ATM surveillance data
showed that they had made more than $190,000 in past attempted
fraudulent EBT withdrawals from a single bank since October
2022.  One additional defendant possessed 269 cloned EBT cards
at the time of arrest, and later analysis of historic ATM
surveillance data showed that the defendant had made more than
$70,000 in past attempted fraudulent EBT withdrawals from a
single bank since January 2023.  All three of these defendants
were determined to be citizens Romania, who did not have
documentation to be lawfully present in the United States.  The
three arrested defendants were ordered detained pending trial by
the Hon. Karen Stevenson and Hon. Margo A. Rocconi.  A federal

grand jury returned two indictments against the three defendants for bank fraud, in violation of 18 U.S.C. § 1344; aggravated identity theft, in violation of 18 U.S.C. § 1028A; use of unauthorized access devices, in violation 18 U.S.C. § 1029(a)(2); and possession of unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3), in 23-CR-0076-FLA and 23-CR-0077-JFW.

28.  In or about March 2023, federal law enforcement conducted another surveillance and arrest operation in the Los Angeles, California area. Law enforcement established surveillance around the dates when benefits had been disbursed at select high-volume EBT fraud ATMs. Law enforcement arrested eleven suspects that conducted a high volume of unauthorized transactions and that conducted those transactions in rapid succession. At the time of their arrest, the suspects had in their possession over 400 cloned cards, $120,000 in illicitly obtained funds, and multiple skimming devices.

29.  Ten out of the eleven of these defendants were determined to be citizens of Romania, who did not have documentation to be lawfully present in the United States.

**C.  Background of Current Operation to Combat EBT Fraud**

30.  The most current data provided by DSS, based in part upon reported fraud by victims, indicates that between January 2024 and January 1, 2025, more than approximately $126.8 million in cash benefits has been stolen from victim EBT cards throughout California.

31.  Of the more than approximately $126.8 million in cash benefits stolen during this year time period, more than approximately $57.9 million has been stolen from victim EBT cards, in the county of Los Angeles alone.  The majority of these funds were stolen through unauthorized ATM withdrawals.

32.  Between on or about December 1, 2024, and on or about December 31, 2024, according to data from DSS, more than approximately $11.4 million was stolen from victim EBT cards largely through unauthorized ATM withdrawals.  Of the approximately $11.4 million stolen from victim EBT cards in the month of December 2024, more than approximately $6.2 million was stolen, mostly through unauthorized ATM withdrawals, in Los Angeles County alone.

33.  Based upon my training and experience conducting access device fraud investigations, I know that suspects committing access device fraud schemes will often target particular BINs when harvesting stolen card information collected from skimming devices.  Thus, suspects using skimming may target the BIN associated with DSS, in essence, targeting CalFresh and CalWORKs benefits.  Moreover, based upon my training and experience, the sheer volume of unauthorized ATM withdrawals occurring during the early days of the month is further indicative that suspects participating in the fraud scheme at issue are targeting EBT cards because benefits are typically disbursed to EBT cardholders during the early days of each month.

34.   Law enforcement has also reviewed ATM surveillance provided by financial institutions that administer EBT accounts that relate to the fraud scheme at issue.  During the unauthorized ATM withdrawals, suspects can often be seen holding stacks of cards and conducting withdrawals in quick succession at one ATM.  Based upon my training and experience, I know that suspects perpetrating access device fraud schemes will often conduct unauthorized withdrawals using cloned cards in rapid succession at ATMs.

35.   Based upon the rapid succession of unauthorized ATM withdrawals being conducted, the fact that the cards being used to conduct the unauthorized cash withdrawals are nearly all cloned EBT cards, and the fact that nearly all of the unauthorized withdrawals are happening during the early days of the month, I believe that suspects participating in the fraud scheme at issue are ostensibly targeting EBT cards.

**D.    VILLA Committed EBT Fraud Using Unauthorized Access Devices on April 2, 2025**

36.   Based upon the large dollar amount being stolen from victim EBT cards, the number of victims impacted, the concentration of unauthorized ATM withdrawals occurring in particular areas, and the large number of unauthorized ATM withdrawals occurring at singular bank locations, law enforcement conducted a surveillance and arrest operation in April 2025.

37.  Based upon my training and experience, I know that as an anti-fraud measure, Cal DSS places an embargo on EBT

accounts, such that EBT cardholders are not able to conduct cash withdrawals from their EBT cards until approximately 6:00 a.m., on the morning that their funds load (i.e., the 1st, 2nd, or 3rd of the month, depending on the account)

38.  On or about April 2, 2025, beginning at approximately 5:30 a.m., law enforcement agents, including me, began surveillance on the Target Bank.  Based on my own participation, my review of law enforcement reports, and my conversations with other law enforcement personnel, I know that agents were positioned in an area within direct view of the Target Bank ATMs. Agents could observe individuals walking up to the Target Bank ATM and conduct transactions at the ATM.

39.  At approximately 6:27 a.m., law enforcement officers observed VILLA enter the Target Bank parking lot in a navy blue Mazda SUV, bearing California plate 9NFH682, exit the vehicle, and walk up to the Target Bank ATM terminal.  Law enforcement saw VILLA conduct multiple transactions and remain at the Target Bank ATM for an extended period of time.

40.  From approximately 6:27 a.m. to 6:32 a.m., based on law enforcement officers' observation of VILLA and review of transactions provided by FIS, VILLA used five different access cards and attempted to use one account twice, for a total of six attempts (accounts ending in -5233, -9239, -3381, -0346, -4718 respectively) to withdraw approximately $1,600.

41.  Based upon my training and experience, individuals conducting legitimate transactions at ATMs typically conduct a single transaction and do not transition between multiple

payment cards rapidly to conduct several transactions in a short period of time.

42.   Based on the date, time, ATM location, presence of multiple, and successive ATM withdrawals on multiple EBT cardholder accounts during a short time period, law enforcement detained VILLA in order to investigate further.

43.   After being detained, VILLA had approximately seven cloned cards and bulk cash in her wallet, and SUBJECT DEVICE 1. The cloned cards had stickers placed on them with, what appeared to be, based on my training and experience, card balances and victim PINs.  The following photo is the cloned cards seized from VILLA:



44.  A team of USSS Special Agents, HSI Analysts, and USSS Analysts analyzed the magnetic stripe of the cloned cards and determined all of them were encoded with mismatching card numbers.  All seven of the cards VILLA possessed at the time of arrest were encoded with California EBT BINs. Moreover, the cloned cards also were affixed with stickers bearing victim PINs and balances that closely corresponded to each cloned card and withdrawal amount and were needed in order to conduct the unauthorized ATM withdrawals.

45.  When searching VILLA following her arrest, law enforcement found a car key fob in her possession.  Based on my training and experience and discussions with other law enforcement who specialize in EBT fraud, I know that EBT fraudsters typically travel by car because time is of the essence: EBT fraudsters cannot withdraw EBT funds until the embargo lifts at 6:00 a.m., but if they wait too long, the funds may be withdrawn by the legitimate EBT accountholder or by other EBT fraud crews who have stolen the same account information. When EBT fraud teams approach each bank, they typically bring with them only a few of the EBT cards in their possession, so as to avoid attracting attention and to minimize evidence of a crime found on their person.  For these reasons and others, based on their training and experience, law enforcement believed that evidence of EBT fraud would likely be found in VILLA's car.

46.  After detaining VILLA, law enforcement officers searched VILLA's vehicle, the navy blue Mazda SUV. VILLA claimed the vehicle was a rental and was given to her by an unknown

person.  Law enforcement found a second wallet, red in color, with VILLA's personal identification cards and personal bank cards.  The search also found SUBJECT DEVICE 2.

47.  Based on my review of transaction information by FIS and law enforcement observation of VILLA at the Target Bank, VILLA performed six transactions involving EBT card numbers -- all of which matched EBT card numbers encoded on the cloned cards seized from VILLA incident to her arrest. Three of those transactions were successful withdrawals totaling $1,600 in financial loss.  The remaining three transactions were attempted, but not authorized, transactions totaling $2,120 in attempted financial loss. VILLA had approximately $1,700 in cash in her pink wallet, which is close to the amount that was withdrawn from the Target Bank.

48.  Based on my review of EBT cardholder information obtained from FIS, none of the EBT cards transacted by VILLA belonged to her. Specifically, while VILLA was at the Target Bank ATM, law enforcement learned from FIS that VILLA made approximately six withdrawals later determined to belong to five separate EBT accounts (accounts ending in -5233, -9239, -3381, -0346, and -4718 respectively) belonging to victims K.B., R.J., D.M., V.B., and D.A. Law enforcement similarly confirmed with California's Department of Motor Vehicles ("DMV") that the individual conducting the ATM withdrawal, VILLA, did not appear to match victims K.B., R.J., D.M., V.B., and D.A.

49.  During processing, VILLA admitted to being a citizen and national of Colombia.  VILLA further admitted to being in

the U.S. as a lawful permanent resident (LPR).  VILLA provided a
Colombian Identification card and a Florida Driver's License.

50.  The SUBJECT DEVICES that were retrieved from VILLA's
waistband and rental vehicle were subsequently secured and
transported to HSI's Paramount office, where they are being
securely held pending issuance of a search warrant.

51.  During the search incident to arrest, Detective V.
Munoz, with the Los Angeles County District Attorney's Office
Bureau of Investigation, informed me that VILLA asked to speak
with a lawyer before any questioning.

V.  **TRAINING AND EXPERIENCE REGARDING IDENTITY THEFT CRIMES**

52.  Based on my training and experience and information
obtained from other law enforcement officers who investigate
identity theft, I know the following:

a.   It is common practice for individuals involved in
identity theft, bank fraud, and access device fraud crimes to
possess and use multiple digital devices at once.  Such digital
devices are often used to facilitate, conduct, and track
fraudulent transactions and identity theft.  Suspects often use
digital devices to perpetrate their crimes due to the relative
anonymity gained by conducting financial transactions
electronically or over the internet.  They often employ digital
devices for the purposes, among others, of: (1) applying online
for fraudulent credit cards; (2) obtaining or storing personal
identification information for the purpose of establishing or
modifying fraudulent bank accounts and/or credit card accounts;
(3) using fraudulently obtained bank accounts and/or credit card

accounts to make purchases, sometimes of further personal
information; (4) keeping records of their crimes;
(5) researching personal information, such as social security
numbers and dates of birth, for potential identity theft
victims; and (6) verifying the status of stolen access devices.

      b.  Oftentimes identity thieves take pictures of
items reflecting their stolen identities, including items
retrieved from stolen mail or mail matter, with their
cellphones.

      c.  It is also common for identity thieves to keep
"profiles" of victims on digital devices.  Such "profiles"
contain the personal identifying information of victims, such as
names, Social Security numbers, dates of birth, driver's license
or state identification numbers, alien registration numbers,
passport numbers, and employer or taxpayer identification
numbers.  Identity thieves often keep such information in their
cars, storage units, and in their digital devices.

      d.  It is common for identity thieves, and
individuals engaged in bank fraud, access device fraud, and
identification document fraud to use equipment and software to
print credit and identification cards, to create magnetic strips
for credit cards, to use embossing machines to create credit
cards, to use laser printers to create checks, and to use
magnetic card readers to read and re-encode credit cards.  These
types of devices are routinely kept where the person will have
easy access to such devices, such as on their person or in their
cars or homes or storage units.  Software relevant to such

schemes can also often be found on digital devices, such as computers.

      e.  Based on my training and experience, I know that individuals who participate in identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business. Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos. Suspects may also have paper copies of such records, which they may keep on their person or in their cars, homes, or storage units.

      f.  Individuals engaged in mail and identity theft often use multiple digital devices, which they may keep on their person or in their cars or homes.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

53. As used herein, the term "digital device" includes the SUBJECT DEVICES.

54. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally,

when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

       b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

       c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

55.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

56.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

21

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress VILLA's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of VILLA's face

with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

57. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

58. For all of the reasons described above, there is probable cause to believe that VILLA has committed a violation of 18 U.S.C. § 1029(a)(2) (use of unauthorized access devices). There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES as described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 3rd day of
April, 2025.

_____
THE HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE